IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. DAVID PEREZ-MONTAÑEZ Defendant. | Criminal No. 96-244 (PG) |

**SENTENCING MEMORANDUM**

TO THE HONORABLE JUAN M. PEREZ-GIMENEZ
UNITED STATES DISTRICT JUDGE
FOR THE DISTRICT OF PUERTO RICO

**COMES NOW** petitioner, DAVID PEREZ-MONTAÑEZ (hereinafter "Mr. Perez-Montañez"), represented by the Federal Public Defender for the District of Puerto Rico through the undersigned attorney, and very respectfully states, alleges and prays as follows:

### I. INTRODUCTION

The same way that death is different, in recent years there has been a trend in Supreme Court decisions to distinguish, consistent with Eighth Amendment principles, what kinds of punishments can be imposed on juveniles vis a vis adults. The most recent expression by the Supreme Court was Miller v. Alabama, 132 S. Ct. 2455 (2012), where the Court held that it violates the Eighth Amendment to impose a sentence of life without parole on a juvenile offender convicted of a homicide crime unless the juvenile has an opportunity to persuade the sentencing judge that mitigating factors should call for a sentence that carries some possibility of eventual release.

At the time of his original sentencing hearing in 1998, Mr. Perez-Montañez, who was a juvenile at the time he committed the offense, received a sentence of life under a

mandatory sentencing guideline regime. The Court had absolutely no discretion to consider mitigating factors that may have persuaded it to impose a term-of-years sentence that could provide the possibility of eventual release. Accordingly, based on the ruling in <u>Miller v. Alabama</u>, which has been made retroactively applicable to cases on collateral review, both Mr. Perez-Montañez and the government agreed that habeas relief was warranted and that Mr. Perez-Montañez had to be re-sentenced in accordance with <u>Miller</u> and the Eighth Amendment. The Court has scheduled Mr. Perez-Montañez' re-sentencing hearing for January 30, 2014.

The parties in this case have reached an agreement to recommend to the Court that the defendant be re-sentenced to a total of 360 months, that is, 30 years of imprisonment. For the reasons set forth below, and in consideration of the sentencing factors found in 18 U.S.C. § 3553(a), Mr. Perez-Montañez respectfully moves the Court to re-sentence him to the agreed upon term of 360 months. It is submitted that, under the circumstances of this case, such sentence is sufficient and not greater than necessary to accomplish the statutory goals of sentencing.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Perez-Montañez was convicted in this Honorable Court under Criminal No. 96-244 (PG) of a violation to 18 U.S.C. § 2119(3), carjacking resulting in death, and a violation of 18 U.S.C. §§ 924(c)(1) and 2, using and carrying of a firearm during and in relation to the commission of a crime of violence in its aiding and abetting modality. (Superseding Indictment, Criminal No. 96-244 (PG), Docket No. 71.) The conviction obtained on March 20, 1998 after the jury returned a verdict of guilty as charged. (<u>Id.</u>, Docket No. 133.) Judgment was issued on July 20, 1998 sentencing Mr. Perez-Montañez to life in prison as to count one and 5 consecutive years as to count two. (<u>Id.</u>, Docket No. 147.) Supervised

release terms of 5 and 3 years were imposed respectively, concurrent with each other, if Mr. Perez-Montañez was ever released from prison. (Id.)

The facts of this case are mostly summarized from the version contained in the Pre-sentence Investigation report which for purpose of this proceeding are not disputed. On or about February 7, 1996, Carmelo Serrano-Benitez, along with Jose Raul Santiago, and Mr. Perez-Montañez met at the latter's home in Caguas, Puerto Rico, to plan the carjacking of a 1983 wine colored Toyota Corolla 1.8 station wagon belonging to the victim, Jose David Vazquez-Rivera. They agreed that the robbery would have to take place the following day, as it was Santiago's day off from work. The reason that Mr. Santiago wanted to take the car was that he also drove a 1981 Toyota Corolla 1.8 station wagon and needed bumpers and other parts for his car.

The very next day, February 8, 1996, Serrano, Santiago, and Mr. Perez-Montañez finalized the details for carrying out the carjacking of the Toyota Corolla station wagon belonging to the victim. Sometime thereafter, Serrano, driving the wine colored Oldsmobile Cutlass that belonged to Santiago, drove both Santiago and Perez-Montañez to a house in Sector El Cinco, Caguas, Puerto Rico, where the victim was doing construction work. Mr. Serrano dropped off Santiago and Perez-Montañez, and watched as they approached the house under construction. The victim's vehicle was parked at said house. Both co-defendants used masks to disguise themselves since the victim knew Pérez-Montañez. Co-defendant Santiago was armed with a firearm, and they also took rope in order to tie up the victim.

After the co-defendants entered the house, Serrano returned to Santiago's residence in Sector Hormigas, Caguas, to await their return. Subsequently, Santiago and Mr. Perez-

Montañez returned driving the victim's wine colored Toyota Corolla 1.8. Mr. Perez-Montañez then admitted to Serrano that when he and Santiago approached the victim, he attempted to tie him up. However, a struggle ensued and the victim was able to remove the mask that Perez was wearing and recognized him. Mr. Santiago then shot the victim. They then removed the car keys from the victim's pocket and took the vehicle.

### III.  APPLICABLE LAW AND DISCUSSION

**A. The PSR**

Deputy Chief, United States Probation officer Zulma Basora prepared a very thorough update to the PSR in this case, after interviewing Mr. Perez-Montañez and contacting his family members. The now advisory sentencing guidelines computation contained in the PSR with respect to Count One, the carjacking count, and as to which the defendant has no objection, call for a total adjusted offense level of 43. That offense level yields a guidelines sentencing range of life regardless of the criminal history category that is assigned. Count two, additionally, carries a statutory term of five years which must be consecutive to any term of imprisonment that is imposed as to Count One. See 18 U.S.C. § 924(c).

Relevantly, in the section of the PSR titled "Sentence Outside the Advisory Guideline System" the probation officer provided the Court with a discussion of factors that may warrant the Court's use of its discretion to impose a sentence outside the applicable guidelines sentencing range. These factors are suggested to the Court not only because they are relevant to sentencing in the post-Booker world, but also because they are the factors that the Supreme Court listed in Miller as support, at least in part, for the Court's conclusion that mandatory life without parole for a juvenile homicide offender violates the

constitutional ban against cruel and unusual punishment. Mr. Perez-Montañez thus submits that the Court should adopt the recommendation of the PSR to consider the sentence outside of the guidelines range that the parties in this case have agreed to recommend: a total of 360 months.

### B. Section 3553(a) Factors

The following discussion of the factors set forth at 18 U.S.C. § 3553(a) as they apply to Mr. Perez-Montañez is made in order to assist the Court in determining whether the sentence that the parties are recommending herein is reasonable. Although the PSR contains a complete and exhaustive narrative of information covering many of the factors, Mr. Perez-Montañez believes important to highlight some of them for the Court's consideration.

#### *1. History and Characteristics of the Defendant*

Mr. Perez-Montañez is currently 35 years old. At the time of the offense, however, he was 17 and thus a juvenile under federal law. Proceedings were initiated to transfer him to adult status upon arrest. See 18 U.S.C. § 5032. He is the second of four children procreated by his father Gerardo Perez who is deceased and Carmen Luz Montañez-Aquino, a 54-year old retired nursing home attendant. Mr. Perez-Montañez was raised in Caguas in a relatively close-knit family type of environment. However, evidence on the record seems to show levels of dysfunction in the family. Nevertheless, all basic needs were satisfied in regards to Mr. Perez-Montañez and there is no evidence of emotional, sexual or physical abuse.

With respect to his education, Mr. Perez-Montañez did not develop the skills–likely because of lack of family support and encouragement–to succeed in school. In fact, Mr.

Perez-Montañez was held back several grades at the elementary level. He ended up abandoning school very young and several of his evaluations demonstrate a difficulty in skills as basic as reading and writing.

When Mr. Perez-Montañez was 10 years old, he fell from a horse and suffered a serious trauma in his cranial area which prompted him to develop epileptic seizures. These seizures lasted for about 4 years and Mr. Perez-Montañez received medication to help control said seizures. The seizures went from "grand mal" type to "absences" which are silent and caused the defendant to become lethargic and drowsy; and lead him to be unable to remember things. In any event, at some point the seizures ended and Mr. Perez-Montañez has not suffered from them ever since.

It is also important to note that Mr. Perez-Montanez legally married while very young, at age 16. His now strange wife, Vanesa Lee Serrano, was 14. From their union, two children were procreated, Kerwin Joel and Jonathan David, ages 18 and 17 respectively. Mr. Perez-Montañez has continued to contact his sons. However, he has not seen them since they were essentially toddlers.

With respect to Mr. Perez-Montañez's involvement in the offense, a statement from his mother is worthy of highlight. She described her son "a respectful and non-violent person" and indicated that "her son engaged in the commission of the instant offense as he was young and immature, easily manipulated and wrongfully influenced by his co-defendant Santiago-Rodriguez." Although this is clearly a mother talking about her son, and in the abstract the statement might not deserve a lot of weight due to obvious bias, Mr. Perez-Montañez submits nonetheless that she was not too far off the mark. The objective mental health evaluations in this case show a very immature young man, who exhibited

poor judgment and difficulty dealing with impulsive behavior. For instance, the evaluation of Dr. Carlos I. Guevara, a clinical psychologist, demonstrates that while "Mr. Perez [was] normally intelligent for his age, [he showed] obvious signs of emotional immaturity which includes lack of motivation for developing the competencies expected of adults in our society and difficulties in the utilization of his normal capacities for abstract thought and judgment in the concrete situations in which he has to perform." Similarly, Dr. Cynthia Casanova, a psychiatrist retained by the government, concluded in general:

> In regard to his psychological maturity, it is my opinion that [Mr. Perez-Montañez] shows evidence of occasional poor judgment as manifested by history of impulsive behavior and poor capacity to postpone gratification. He has also been brought up to become emotionally and economically dependent on others reducing his perception of risk, increasing his tendency to respond to peer pressure and emphasizing the short term consequences of his decisions rather than the long term outcome.

Thus, it seems that Mr. Perez-Montañez' involvement in this offense, as described by his mother, was the result of obvious immaturity, poor impulse control and perception of risk as well as inability to handle peer pressure. We must not forget that the offense in this case occurred while Mr. Perez-Montañez relied on his brother in law, an adult who had a significant influence over him.

     As the years have gone by, Mr. Perez-Montañez has shown clear signs of maturity. For instance, during the trial and original sentence in this case, Mr. Perez-Montañez did not admit responsibility for the offense. The original PSR so indicates. This time around, he admitted responsibility and acknowledged the seriousness and gravity of his conduct. Mr. Perez-Montañez recognizes that he got involved in an act and put in motion a series of actions and events that resulted in the life of a human being taken. He has had to live with that in his conscience and feels terrible for it. All this shows the evolution in character that

Mr. Perez-Montañez has exhibited almost 18 years later and speaks volumes as to his prospects of rehabilitation.

One sad note that we must report is that upon learning that he had been sentenced to life and that he had absolutely no hope of ever been released, Mr. Perez-Montañez sort of gave up on life. He did not attempt suicide or anything like that, but in essence severed ties with most of his family except his sons, has not received visits in all these years and even decided to mark his body with tattoos. One of his tattoos is the one that impacted the undersigned the most. He wrote the words "game over" above of his upper lip shortly after his sentence. This shows the Court that Mr. Perez-Montañez fell into a deep state of depression and lack of motivation. Interestingly, however, that did not dissuade Mr. Perez-Montañez from at least trying to better himself. He has enrolled though not completed his GED (has had a tough time with passing the classes). He has taken many extra-curricular courses and more importantly, has been employed throughout all these years as orderly, in the food services department and in UNICOR as his progress report shows. Even with his limited skills in reading and writing, Mr. Perez-Montañez has been able to complete an English as Second Language course and a course in computers.

When Mr. Perez-Montañez learned of the possibility of this re-sentencing proceeding, he also regained hope. He now is longing to see his family again and is hopeful that he may some day re-join the free community. There is an obvious change in attitude and outlook regarding life.

Before concluding this discussion, we feel it is also necessary to address the fact that Mr. Perez-Montañez does have a record of disciplinary sanctions at the Bureau of Prisons. As the PSR reports, none of the violations alleged are violent in nature and in fact fall, in

the opinion of the undersigned, in the mild and non-serious category. They range from failure to obey an order such as reporting to a work assignment on time, to having an unauthorized item (a shirt that he found in the trash), to abusing phone privileges and failure to follow safety regulations. The most serious appears to be the possession of a cellular phone in the year 2009. Mr. Perez-Montañez denied the phone was his but admitted using it.

His history and characteristics point to a person that does not need to spend the rest of his life in prison in order to address other components of sentencing such as deterrence, protection of the public and respect for the law. Back in 1998 when this defendant was sentenced, not only was the Court precluded from considering this factor; the Court did not have the option of considering post-sentence rehabilitation as it can now, see Peper v. United States, 131 S. Ct. 1229 (2011). Moreover, the advantage of a re-sentencing, specially these many years later, is that it allows the court to gauge rehabilitation and better predict the prospect of a successful adjustment and transition to the free community, something that it is almost impossible to measure at an original sentence.

### 2. Nature and Circumstances of the Offense

The offense in this case is very serious. A human being was murdered in the course of committing a carjacking. The only way this offense could have been more serious in regards to Mr. Perez-Montañez was if he himself had pulled the trigger. He did not. It was his co-defendant who made the decision to kill the victim. Nevertheless, there is no denying that this was a carefully planned robbery and that Mr. Perez-Montañez knew or should have anticipated that it could escalate in the level of violence to the point that a person was killed. His involvement in the offense was thus inexcusable.

Notwithstanding, by constitutional mandate and per Supreme Court precedent, the Court needs to evaluate his participation in the context of his age at the time and what the Supreme Court in <u>Miller</u> labeled as the "mitigating qualities of youth." We are specifically referring to the lack of maturity and the underdeveloped sense of responsibility that often leads to recklessness, impulsivity, and heedless risk taking. Juveniles, the Supreme Court in <u>Miller</u> explained, are more vulnerable to negative influences and outside pressures including from his family and peers. In this case, we can see that Mr. Perez-Montañez fell victim to said pressures from someone that not only was his peer, but also a member of his extended family. It is within this context that we ask the Court to valuate the nature and circumstances of the offense and the role of Mr. Perez-Montañez in it. It was his co-defendant, an adult, who planned the carjacking. It was the co-defendant who needed the parts for his car. It was the co-defendant who brought a firearm. It was the co-defendant who shot the victim.

### *3. Seriousness of the Offense, Respect for the Law, Deterrence and Punishment*

A sentence of 360 months (30 years) is not a lenient sentence by any stretch of the imagination. We submit that it is proportionate to the seriousness of the offense in light of Mr. Perez-Montañez' participation. It is also sufficient to address the very important components of respect for the law, deterrence of criminal conduct by the public in general and as to Mr. Perez-Montañez, and to severely punish him for his terrible conduct but while also taking into account the Eighth Amendment concerns that dictate that children are different and that the most severe punishment should be reserved to people other than children.

### *4. Protection of the Public*

A very valid reason to harshly punish the defendant with a significant term of imprisonment is undoubtedly the need to incapacitate him in order to prevent further harm to the public. Nonetheless, even when we acknowledge this valid goal, the record in this case shows that this concern is somewhat ameliorated and diminished in this case based on the background of the defendant and his conduct prior to and in the years following the offense. Mr. Perez-Montañez did not exhibit a proclivity to violence prior to his involvement in this case and has maintained a record, while incarcerated for the past 17 years, of conduct that demonstrates no violent tendencies. Therefore, a 30-year sentence more than adequately addresses this sentencing factor.

### *5. Educational and Vocational Training, Medical Care and Correctional Treatment*

This is a neutral factor in the analysis since even though Mr. Perez-Montañez has suffered from physical and mental conditions, his time under the custody of BOP seem to have benefitted him greatly. He has likewise received the benefit of educational opportunities and some vocational training that certainly have given him a set of skills that he can use in the free community if the Court fashions a sentence that allows for eventual release. The hope of possible release, as opposed to his prior feeling of helplessness, has been the best therapy and treatment that Mr. Perez-Montañez could have received in order to have a positive attitude. We submit that this increases the likelihood of a complete and successful rehabilitation.

### *6. Avoidance of Unwarranted Sentencing Disparities*

In this district, and specially in recent years, violent offenses in which death resulted have on occasion been the subject of negotiation by the parties, and sentences of less than

11

life have been imposed. Several come to mind because they were handled by the Office of the Federal Public Defender. For instance, in the case of <u>U.S. v. Mario-Rivera-Rodriguez</u>, Criminal No. 09-345 (JAG), a carjacking resulting in death, the parties negotiated and the court imposed a sentence of 240 months (20 years). Also, in the case of <u>U.S. v. Jayson-Casillas</u>, Criminal No. 10-103 (JAG), a carjacking resulting in death, the sentence imposed was 276 months (23 years). In the case of <u>U.S. v. Angel Santana-Espinet</u>, Criminal No. 10-138 (GAG), a carjacking resulting in the death of two law enforcement officers, the defendant received a sentence of 380 months (31.6 years). In the case of <u>U.S. v. Eduardo Herrero-Serrano</u>, Criminal No. 10-411 (GAG), a kidnaping for ransom resulting in death, the parties reached a binding agreement to recommend a sentence of 240 months (20 years). In another case, one before this Court, involving carjacking resulting in death, this Court sentenced the defendant to 168 months. <u>See</u> <u>U.S. v. Rafael Quiles-Arce</u>, Criminal No. 95-021 (PG). We are sure there are other examples that we are unable to cite at this time.

Also, we readily admit that all cases are different and that the defendants in the above-cited cases may or may not be similarly situated. The circumstances are also different; some may involve cooperation. All involve pleas of guilty while Mr. Perez-Montañez went to trial. These cases are brought to the Court's attention for the proposition that it is not unheard of in this district that defendants involved in offenses that resulted in death and that likely would call for a sentence of life, received sentences of terms of years. It is also necessary to note that none of the defendants in the above-cited examples were juveniles. And as we have repeatedly argued, recent caselaw requires a different treatment of minors. Therefore, the Court could consider that the sentence recommended herein is appropriate and in line with other similar cases thus avoiding unwarranted disparities.

## IV. CONCLUSION

In <u>Miller</u>, after invalidating as unconstitutional mandatory life without parole sentences for juvenile offenders, the Court stated that because they have diminished culpability and heightened capacity for change **"appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."** 132 S. Ct. at 2469. That is, the Court recognized that a life sentence on a juvenile will be unjust in a majority of the cases. In view of this, and in view of all of the above, we ask the Court to accept the recommendation of the parties in this case and impose a total sentence of 360 months on Mr. Perez-Montañez. The same is sufficient and not greater than necessary.

WHEREFORE, it is respectfully requested that the Court take notice of the present memorandum and that the sentence requested herein, 360 months, be imposed.

I HEREBY CERTIFY that on this date I filed the present memorandum using the CM/ECF system which will send electronic notification of this filing to all parties of record including counsel for the government.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 24th day of January, 2014.

**HECTOR E. GUZMAN, JR.**
**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF PUERTO RICO**

*S/Hector L. Ramos-Vega*
Hector L. Ramos-Vega
Assistant Federal Public Defender
USDC-PR 222504
241 F.D. Roosevelt Ave.
Hato Rey, P.R. 00918-2441
(787) 281-4922/ Fax (787) 281-4899
E-mail: Hector_Ramos@fd.org